**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHRISTOPHER R. BENSON,

Plaintiff,

-against-

FAMILY DOLLAR STORES, INC., FAMILY
DOLLAR STORES OF NEW YORK, INC., and
FAMILY DOLLAR OPERATIONS, INC.,

Defendants.

**COMPLAINT**

**Demand for Jury Trial**

Civil Case No.: 6:12-CV-1457
[NAM/ATB]

Plaintiff, Christopher R. Benson, by and through his attorneys, Donohue, Sabo, Varley & Huttner, LLP, hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.    This is a civil action for disability discrimination and retaliation in violation of the Americans With Disabilities Act of 1990, as amended ("ADA"), 42 USC §§ 12101 et. seq., for age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§621, et. seq. and for discrimination and retaliation in violation of the New York State Executive Law sections 296-301, also known as the New York State Human Rights Law ("NYSHRL").

2.    This court has jurisdiction over this matter under 28 U.S.C. §1331.

3.    This court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over plaintiff's claims under the law of the State of New York.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) and (2).

5. Plaintiff Christopher R. Benson is a resident of the city of Rome, County of Oneida and State of New York.

6. Defendant Family Dollar Stores, Inc. is a corporation duly organized and existing pursuant to the laws of the State of North Carolina.

7. Defendant Family Dollar Stores, Inc. operates retail stores in the State of New York and employs in excess of 500 persons.

8. Defendant Family Dollar Stores of New York, Inc. is a domestic corporation, which operates retail stores in the State of New York.

9. Defendant Family Dollar Stores of New York, Inc. employs in excess of 500 persons.

10. Defendant Family Dollar Operations, Inc. is a corporation duly organized and existing pursuant to the laws of the State of North Carolina.

11. Defendant Family Dollar Operations, Inc. operates retail stores in the State of New York.

12. Defendant Family Dollar Operations, Inc. employs in excess of 500 persons.

13. The defendants are collectively referred to herein as "Family Dollar."

## ADMINISTRATIVE EXHAUSTION

14. On February 11, 2011 plaintiff Benson filed a timely complaint against Family Dollar with the U.S. Equal Employment Opportunity Commission, alleging

disability and age discrimination, which was given claim number 525-2011-00287.

**15.**   In December of 2011, plaintiff Benson timely filed a second complaint against Family Dollar with the United States Equal Employment Opportunity Commission alleging retaliation, which was given claim number 525-2012-00161.

**16.**   On or about June 27, 2012 the EEOC provided plaintiff with right to sue letters with respect to claims 525-2011-00287 and 525-2012-00161.

**17.**   This action has been commenced within 90 days of plaintiff's receipt of Right to Sue letters from the EEOC.


## FACTS

**18.**   Plaintiff Benson was employed by Family Dollar in its loss prevention department beginning on February 5, 2003 until his termination on October 14, 2011.

**19.**   Plaintiff Benson was born on ▮▮▮▮▮▮ 1966 and was 45 years old on the date he was terminated.

**20.**   Plaintiff suffers from Addison's disease.  As a complication of Addison's disease, plaintiff suffers from Type I Diabetes, necessitating daily blood sugar testing and daily insulin use.  Plaintiff also went on FMLA leave to undergo and recover from major spinal surgery in January of 2009 and missed two months of work.  Plaintiff twice during his career at Family Dollar had to miss days of work due to incidents of diabetic shock and both times the plaintiff's supervisor at the

time, William McCaslin, was fully aware of the circumstances.

21.　At all times relevant hereto, defendants were aware of plaintiff's medical condition in regard to his Type 1 Diabetes and his need to administer insulin via injection multiple times daily.　Additionally, Family Dollar was fully aware of plaintiff's spinal surgery in January of 2009 and have a record of him being on FMLA leave for that reason.

22.　In the fall of 2005, several District Managers reported to the plaintiff a sexual harassment incident involving Divisional Vice President Allen Fields and a Human Resources Manager.　Following Family Dollar protocol the plaintiff reported these complaints to the Vice President of Loss Prevention and the plaintiff was assigned to investigate that sexual harassment incident.

23.　Despite multiple witnesses to the incident no action was taken and Divisional Vice President Fields was not disciplined according to what the Vice President of Loss Prevention communicated to the plaintiff at the time.

24.　In August 2007, Chris Nielsen, at that time a Regional Vice President of Loss Prevention and now the Vice President of Loss Prevention for Family Dollar, told the plaintiff, regarding his taking shots of insulin, that he should not take them in public or at the dinner table of restaurants but should go to restrooms to administer them.　Plaintiff explained to Nielsen that he was following doctor's directions and that delays in taking the shots could lead to health risks including possible death.

25.　In August 2010, plaintiff was informed that he was being demoted from

Regional Loss Prevention Director to the position of Area Loss Prevention Manager.

26.     Plaintiff's demotion was part of an alleged reorganization of the loss prevention department.

27.     At the same time, two other persons in the loss prevention department received promotions from Regional Director to Director.

28.     A number of other Regional Loss Prevention Directors of the loss prevention department were also demoted to Area Loss Prevention Managers at the same time that the plaintiff was demoted.

29.     All the demotions and promotions at that time were done without posting of job openings, solicitation of applications, or interviews for the positions, which had been Family Dollars' previous practice.

30.     The employees who were promoted were younger than the plaintiff and, upon information and belief, did not have health problems similar to the plaintiff.

31.     Other employees who were demoted at the same time were older than the employees who were promoted and/or had significant health problems unlike the employees who were promoted.

32.     Of the 18 Regional Loss Prevention Directors, 8 were demoted down to the entry level position of Area Loss Prevention Manager.  These 8 included all Regional Directors over age 50 and also included all Regional Directors commonly known to have major health issues.  This included two Regional Directors battling

cancer as well as both Regional Directors with Type 1 Diabetes who had to regularly administer shots of insulin to themselves.

33.   More Regional Directors were demoted than was necessary in the design of the realignment which called for a 1 to 2 ratio of Regional Managers to Area Managers.   Approximately five more were demoted than needed to be, to the lowest department status, Area Loss Prevention Manager, considered "entry level".

34.   Upon information and belief, health status and age were determining factors in deciding who should be promoted or demoted as part of the alleged reorganization of the loss prevention department.

35.   Plaintiff's performance in 2010 was superior, both in terms of the number of cases that he handled and his compliance with Family Dollar's goals regarding reduction of shrink losses.   Plaintiff ended the year first in number of overall cases, first in admitted theft cases, first in dollar admissions, and third in prosecutions out of 38 field Loss Prevention professionals.   These results for fiscal 2010 occurred approximately the same time as the realignment.   In two of the three years leading up to the realignment the plaintiff was first in successful cases.

36.   In October 2010, at the annual Loss Prevention meeting, the plaintiff met individually with the Vice President of Loss Prevention, Mike Zuege, at his invitation.   Plaintiff asked about the realignment and how decisions were made on who to promote and who to demote.

37.   Zuege made it clear that neither overall experience, tenure with Family Dollar,

yearly productivity, previous supervisory experience, or education were considered when making the moves.

38. Zuege either refused to explain or was unable to explain what did determine the decisions. Zuege told the plaintiff to take up his concerns with the Human Resources Department.

39. In November 2010 the plaintiff reported to Family Dollar the apparent discriminatory treatment of older employees and employees with health problems that occurred in connection with the alleged reorganization.

40. Plaintiff also reported to Family Dollar that he had been retaliated against for having investigated a claim of sexual harassment against Divisional Vice President Allen Fields. Plaintiff reported that possibly his demotion during the realignment was a further retaliation since Zuege could not supply a reason or rationale for the moves made.

41. Family Dollar's lead investigator into the complaint, Team Relations Manager Vann Mills, told plaintiff Family Dollar would not investigate his claims of age and health discrimination and that they would investigate the claim of retaliation but would only look at recent issues.

42. The plaintiff repeatedly requested, both verbally during phone conversations with Vann Mills and e-mail, that Family Dollar investigate the apparent age and health discrimination. Family Dollar refused to do so. Plaintiff was criticized for demonstrating negativism in connection with the filing of his internal complaint.

43. On December 28, 2010, at the conclusion of Family Dollar's investigation into retaliation, a Family Dollar investigator, Team Relations Manager, Vann Mills, told the plaintiff he was going to coach and counsel him, that he had reached out to peers and inflamed matters and that if he was his co-worker or supervisor things he had written would make him very mad.

44. One of Family Dollar's investigators into his claim, Human Resources Manager, Natalie Neely, during the close out call to the investigation which took place on December 28, 2010, spoke regarding the possibility of the plaintiff taking the matter to authorities outside the company. Neely told the plaintiff he had to make a decision what he wanted his future to be. Plaintiff understood this comment to be a threat.

45. Thereafter on February 11, 2011, the plaintiff filed a complaint with the Equal Opportunity Employment Commission alleging discrimination against himself and other employees based on their age and medical conditions.

46. Plaintiff began to be subject to adverse employment actions almost immediately after filing his complaint with the Equal Employment Opportunity Commission.

47. On March 7, 2011, plaintiff was assigned an extra district to his work responsibilities. This involved 23 Stores located in Pennsylvania and amounted to a workload increase of approximately 20%.

48. No other loss prevention employee had such an increase in their workload

imposed on them.

**49.**   In addition to assigning the Pennsylvania Stores to plaintiff's responsibility, at the same time Family Dollar added poor results from those stores to the plaintiff's record, although those results occurred before the plaintiff was assigned responsibilities for those stores.

**50.**   The plaintiff took over the stores in March 2011 but inventory results, which were primarily extremely poor results from as far back as September 2010, were added to the plaintiff's statistics. These statistical results were posted monthly for plaintiff's peers to observe.

**51.**   In April 2011, in spite of being number one in cases and in the top five in shrink reduction in a department numbering nearly forty professionals, plaintiff received the worst midyear review of his entire career. Plaintiff was scored a 3.0 on a scale of 1 to 5. Upon information and belief this score was the lowest score plaintiff's supervisor gave to anyone he supervised and tied for the lowest score in the entire department.

**52.**   Plaintiff's most recent performance score from the same supervisor on the same scale prior to the plaintiff's EEOC charge was a 3.74 for Fiscal 2010, delivered in October 2010, which was prior to plaintiff's EEOC charge.

**53.**   Plaintiff's performance numbers for mid-year fiscal 2011 were superior to plaintiff's performance numbers for his previous rating. When asked at the end of the review, the reviewer, Regional Vice President of Loss Prevention, Chris

Pomerleau, stated he was aware of plaintiff's EEOC complaint.

**54.** On April 20, 2011 the Regional Vice President of Loss Prevention, Chris Pomerleau, and the Vice President of Loss Prevention, Chris Nielsen, traveled to meet with plaintiff in person at the Rome, New York distribution center. This was the first time in his eight year career with the company that plaintiff had been formally visited by a Vice President of Loss Prevention.

**55.** At that meeting the plaintiff was asked repeatedly to move forward, told that communication with his peers was an opportunity for improvement because he was communicating frustration to his peers and that it was not a good thing if he was calling various people in his department.

**56.** The Vice President of Loss Prevention stated he could not prove what he was saying about the plaintiff but that it was his perception the plaintiff had done these things and that he could do an investigation of the plaintiff if he wanted to.

**57.** In reference to the plaintiff's complaint, the Vice President of Loss Prevention stated he recommended the plaintiff move forward and that would be how he could get to the next level and that focusing on the past was negative.

**58.** At this same meeting the Vice President of Loss Prevention told the plaintiff that he had performance ratings performed by the Team Relations Department, two Divisional Vice Presidents, and by the Human Resources Director and all scored him low. One of the Divisional Vice Presidents was identified as Allen Fields who the plaintiff had previously investigated and recently reported for retaliation.

**59.** The plaintiff protested the validity of this rating because he and Fields no longer worked together and had not spoken in over four years. Plaintiff also objected because Divisional Vice President Fields had been investigated for retaliation and knew the plaintiff had reported him. Nothing was done to eliminate or discount this rating.

**60.** The Human Resources Director who rated the plaintiff's job performance low had never worked with him, never met him, never spoken with him on the phone, and, to plaintiff's knowledge, had never sent or received an e-mail to or from the plaintiff.

**61.** Plaintiff also became subject to increased surveillance beginning April 20, 2011, when his supervisor, Chris Pomerleau, told the plaintiff to call him more often and to report by phone call what he has done every couple of days. In July the plaintiff's supervisor again told plaintiff to call him every couple of days and told plaintiff to copy him on more emails.

**62.** To the plaintiff's knowledge and understanding other professionals supervised by Pomerleau were not asked to do the same. Previous practice was to call the supervisor on an as needed basis or about once every other week.

**63.** The plaintiff was also asked by his supervisor what hotels he stayed at when he traveled to certain areas.

**64.** On April 21, 2011 plaintiff had a conversation with the VP of Loss Prevention Chris Nielsen. Plaintiff stated he knew there were five or six open Regional Loss

Prevention Manager positions that were not being filled and asked what would happen if he dropped his EEOC complaint. Plaintiff was told that he would probably not be promoted. The plaintiff asked why not and Nielsen stated he was concerned that if someone heard that that plaintiff was promoted they might file an EEOC complaint.

**65.** During this conversation Nielsen stated that the plaintiff's supervisor, Chris Pomerleau, needed another Regional Loss Prevention Manager in his area. Despite the admitted need, the position was not filled for months and was still not filled half a year later when the plaintiff was terminated.

**66.** Later in the same above conversation Nielsen told the plaintiff, "You do poison people." This was in reference to the plaintiff allegedly discussing with other members of the loss prevention department concerns with the realignment process and concerns regarding possible age and health discrimination.

**67.** Plaintiff reported to the Senior Vice President of Human Resources, Bryan Venberg, by e-mail his concerns regarding his performance ratings, especially the one done by Divisional Vice President, Allen Fields. Venberg did not answer or respond and this lack of communication continued during the coming months. Plaintiff continued to report concerns about retaliation against him and Venberg never responded.

**68.** Plaintiff sought constructive feedback regarding his alleged low ratings, especially the low Human Resources/Team Relation (HR/TR) Rating, and did this

at the express direction of Vice President of Loss Prevention, Chris Nielsen. Nielsen stated he was not given any explanation for the low ratings so the plaintiff would need to reach out to the raters in order to get any constructive criticism.

69.   The plaintiff contacted his one and only current partner in Team Relations, Team Relations Manager Alex Earle and was told by Earle that Earle rated him high and had no feedback at all for how he could improve because he saw no need to improve.  Earle expressed outrage that the plaintiff had received a low rating in the HR/TR Rating.

70.   Plaintiff spoke with Team Relations Manager, Thomas Alcala, who had recently been assigned to his area just after the HR/TR Ratings.  Alcala told the plaintiff he did not participate in the ratings because he was assigned elsewhere. Alcala stated if he had scored the plaintiff he would have scored his performance high.

71.   Plaintiff contacted Senior Vice President, Bryan Venberg, and Vice President, Jacob Modla, with concerns about how he ended up with a low rating when his only partner in Team Relations rated him high.  In response, Team Relations Director, Cathy Halstead, contacted the plaintiff.

72.   When the plaintiff asked Halstead about the recent HR/TR Rating, Halstead told the plaintiff he was dwelling in the past.  When the plaintiff pointed out Earle had rated him high, Halstead stated she had also scored the plaintiff and implied that Vann Mills and Thomas Alcala had scored the plaintiff as well.

73.   During the course of this conversation Halstead also stated one reason for the plaintiff's low score was sarcasm, and also told the plaintiff he was not being supportive of what was going on and that he came across negatively.

74.   In early May 2011, the plaintiff reported, via written e-mail, directly to the company CEO that several company Vice Presidents appeared to be retaliating against the plaintiff due to the plaintiff's filing a charge with the EEOC. The plaintiff cited reasons and incidents and named the company executives involved. The plaintiff asked for an objective investigation and pleaded for help. Neither the CEO nor any emissary for the CEO responded in any way to his report and no investigation was evident. Thereafter the retaliation continued.

75.   In early May, 2011, plaintiff reported to Vice President, Jacob Modla, concerns with a Human Resources Director performance rating conducted by a Human Resources Manager, Krys Palys-Eldridge, who did not know plaintiff at all and by Divisional Vice President, Allen Fields, someone he had previously investigated, had recently reported for retaliation, and had not spoken with in over four years.

76.   In response, Modla traveled to the Rome, New York distribution center in late May, 2011.  Modla supported and reaffirmed all the ratings as reasonable and legitimate and refused to withdraw any of them.

77.   This meeting was scheduled to occur solely between Modla and plaintiff. Without prior warning, and contrary to previous practice, the plaintiff's supervisor

appeared at the Rome distribution center and participated in the meeting. Additionally, the Vice President of Loss Prevention also appeared without notice, which was his second visit in 5 weeks.

78.  Prior to the meeting, plaintiff's supervisor, Chris Pomerleau, told the plaintiff he was considering giving the plaintiff's top-performing district in New York State to another member of the department and then would assign the plaintiff a poor-performing district in southern Pennsylvania. This would cause the plaintiff's performance to appear much worse and these statistics would be publicly posted for his peers to observe. This move also would have added to the plaintiff's travel time and workload.

79.   During this meeting Vice President Modla stated that the concerns by the plaintiff were about whether the plaintiff wanted to be happy at Family Dollar, suggested the plaintiff may wish to leave Family Dollar, that the plaintiff was unhappy and that they could help him to leave Family Dollar by putting a package together.

80.  Plaintiff responded that he was happy at Family Dollar and loved his job.

81.  On July 1, 2011, the plaintiff spoke with Vice President Modla and asked if the job performance ratings conducted by the Divisional Vice Presidents and Human Resources Director could be used to impact job status. Modla confirmed they could be used to affect future employment or advancement in the company.

82.  Evidence was obtained by the plaintiff that Allen Fields, the Divisional Vice

President investigated by him, had not, in fact, ever rated him. Divisional Vice President Fields was terminated by Family Dollar less than two weeks after two Company Vice Presidents indicated he had rated the plaintiff's job performance low.

**83.** On July 7, 2011, plaintiff's supervisor Chris Pomerleau provided the plaintiff with a five-page memorandum referring to alleged compliance issues. This is the first formal written reprimand the plaintiff had received in his entire tenure with the company.

**84.** The plaintiff was never advised verbally to fix the issues noted prior to the written reprimand. The plaintiff pointed out factual errors in the reprimand but his supervisor did not correct them.

**85.** Plaintiff was given a deadline of eight days after issuance of the memorandum to prepare a plan of action to improve the areas that were identified. Plaintiff was not informed verbally of this requirement and had to read his copy on his own to find out.

**86.** The memorandum had a section for the recipient to write any disagreements with the content of the written reprimand. However, although the plaintiff was asked to sign the document, he was never informed or offered the opportunity to note errors or objections in written form.

**87.** To the knowledge of the plaintiff no other member of his department had ever been issued a memorandum prior to the one issued to him.

**88.**  On July 12, 2011, plaintiff spoke with his supervisor and asked about an open Loss Prevention Director position that was posted internally.  Plaintiff was told he would not be considered for that position.  The position was subsequently filled by a younger person who does not share the plaintiff's health problems.  This person had less overall experience, a shorter tenure with the company, and, in fact, had been trained by the plaintiff.

**89.**  In July of 2011, the plaintiff, due to a lack of response and due to further acts of retaliation, again sent an e-mail to the company CEO, Howard Levine, asserting that various Vice Presidents were continuing to retaliate against him.

**90.**  In response to this contact a Dollar Stores in-house legal counsel, Reginald Johnson, sent an e-mail to the plaintiff stating Family Dollar would look into his complaint.  In August, the same Dollar Stores in-house counsel told the plaintiff that the law firm of Littler Mendelson would be conducting an investigation and to work with them cooperatively, including meeting with them in person.

**91.**  In late August of 2011 the plaintiff did meet with attorneys from the law firm of Littler Mendelson.  The plaintiff supplied Littler Mendelson with evidence of retaliation.  The attorney from Littler Mendelson refused to show the plaintiff his own ratings, stating Family Dollar would not allow him to do so.

**92.**  Plaintiff asked Littler Mendelson to look at the ratings because Company executives told him Divisional Vice President Allen Fields rated him but Allen Fields adamantly claimed he had never rated the plaintiff.  Plaintiff advised Littler

Mendelson that if there was no rating by Fields it would mean Family Dollar executives who stated Fields rated the plaintiff would be guilty of retaliation. Plaintiff advised Littler Mendelson that if they did see a document appearing to be a rating by Fields they should contact Fields who was adamant and certain he never rated the plaintiff.

**93.**   Six weeks later, on October 5th, 2011, the plaintiff was told in an e-mail by Family Dollar's in-house legal counsel, Reginald Johnson, that "Littler was unable to substantiate any allegations set forth in your complaints, which included allegations of discrimination and retaliation.  Further, Littler concluded that the conduct of Family Dollar as it pertains to your employment was not unlawful or in violation of your rights or its Company policies."

**94.**   The plaintiff asked Johnson to answer whether or not Divisional Vice President Allen Fields had rated his job performance and if there was a rating on file from him.  Johnson refused to answer the question.

**95.**   Finally on October 14, 2011, the plaintiff's employment was terminated over the phone by Vice President of Loss Prevention Chris Nielsen, one of Family Dollar Vice Presidents that the plaintiff had reported for retaliation.  Nielsen was also one of the Family Dollar executives Littler Mendelson had interviewed as part of their investigation into retaliation.

**96.**   Nielsen told plaintiff he was being terminated for being unhappy and dissatisfied with his status at the company.  Nielsen refused to explain further and

refused to answer questions and plaintiff was told to direct questions to Director of Team Relations, Cathy Halstead.

**97.**   Halstead refused to speak to plaintiff over the phone but instructed him to send her all his questions via e-mail.  Plaintiff sent Halstead 20 questions and she would only answer two of them.

**98.**   When the plaintiff asked Halstead why he had been terminated she wrote to him in an email "... It was clear from the verbal and written communications with management that you are unhappy and dissatisfied with your status with the company."

**99.**  The statement that the plaintiff was unhappy and dissatisfied with his status at Family Dollar is untrue.  Plaintiff reported retaliation by Company executives and reported age and health discrimination but did not report being unhappy and dissatisfied and was, in fact, happily and satisfactorily employed at a job he loved up until he was terminated.

**100.**  When the plaintiff reported to Dollar Stores that he was happy and satisfied with his employed status with Family Dollar no correction to the termination or offer of re-employment was made by Family Dollar.

**101.**  The October 14, 2011, termination occurred on the last work day before the start of the annual Loss Prevention meeting.  This timing maximized the attention of the plaintiff's peers to his termination and also maximized the embarrassment to the plaintiff and the damage to the plaintiff's career.

**102.** The October 14, 2011, termination occurred just one or two weeks before the plaintiff would have received his annual performance bonus based on work completed in fiscal 2011 which ended at the end of August 2011. Employees are required to still be employed near the end of October each year in order to receive the bonus. This bonus was approximately $15,000.00 and the plaintiff did not receive it due to the timing of the termination.

**103.** Dollar Stores offered plaintiff a severance package including half a year's pay, a neutral recommendation to future employers, and an agreement not to fight any unemployment claims. In exchange Family Dollar demanded a written agreement from the plaintiff that he would not work with State or Federal authorities against Family Dollar and specifically that the plaintiff would not pursue any claims involving age or disability. Plaintiff refused to sign.

**104.** In November the plaintiff sent certified letters to the CEO and to the other 15 members of the company Board of Directors reporting and providing evidence regarding the wrongful termination and retaliation. The plaintiff asked for an investigation and remedy. No one contacted the plaintiff in any way and no investigation was apparent or reported.

## AS AND FOR FIRST CAUSE OF ACTION AGAINST DEFENDANTS PURSUANT TO 42 U.S.C. 12101 et. seq.

**105.** Plaintiff hereby repeats and realleges paragraphs "1 through 104" as if

separately stated hereinafter.

106.   Plaintiff is disabled within the meaning of the ADA.

107.   Alternatively plaintiff was considered disabled by Family Dollar.

108.   Plaintiff has been discriminated against in the terms and conditions of employment as a result of his actual or perceived disability.

109.   Plaintiff was subject to adverse employment actions, including termination, because of his disabilities.

110.   Plaintiff requests relief as provided for in the Prayer for Relief below.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS PURSUANT TO 42 U.S.C. §12203(a)

111.   Plaintiff hereby repeats and realleges paragraphs "1 through 104" as if separately stated hereinafter.

112.   Plaintiff's internal complaints of disability discrimination with respect to himself and other employees and his complaint to the EEOC of disability discrimination constitute protected activities under the ADA.

113.   Defendants retaliated against plaintiff by subjecting him to adverse employment actions, including termination, as a result of his internal complaints and his filings with the EEOC.

114.   Plaintiff requests relief as provided for in the Prayer for Relief below.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT
PURSUANT TO 29 USC 621 ET. SEQ.**

**115.** Plaintiff hereby repeats and realleges paragraphs "1 through 104" as if separately stated hereinafter.

**116.** Plaintiff is an individual protected under the ADEA.

**117.** Plaintiff was subject to adverse employment actions, including termination, because on account of his age in violation of the ADEA.

**118.** Plaintiff requests relief as provided for in the Prayer for Relief below.

**AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT
PURSUANT TO 29 USC 621 ET. SEQ.**

**119.** Plaintiff hereby repeats and realleges paragraphs "1 through 104" as if separately stated hereunder.

**120.** Plaintiff's internal complaints of age discrimination with respect to himself and other employees and his complaints to the EEOC of age discrimination constitute protected activities under the ADEA.

**121.** Defendants retaliated against plaintiff by subjecting him to adverse employment actions as a result of his internal complaints and his filings with the EEOC.

**122.** Plaintiff requests relief as provided for in the Prayer for Relief below.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT PURSUANT TO THE NYSHRL.

**123.**   Plaintiff hereby repeats and realleges paragraphs "1 through 104" as if separately stated hereunder.

**124.**   Plaintiff was subject to adverse employment actions, including termination, based upon his age and disability in violation of the NYSHRL.

**125.** Plaintiff requests relief as provided for in the Prayer for Relief below.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT PURSUANT TO THE NYSHRL

**126.**   Plaintiff hereby repeats and realleges paragraphs "1 through 104" as if separately stated hereunder.

**127.**   Plaintiff's internal complaints of age discrimination and disability discrimination with respect to himself and other employees and his complaints to the EEOC of age discrimination and disability discrimination constitute protected activities under the NYSHRL.

**128.**   Defendants retaliated against plaintiff by subjecting him to adverse employment actions as a result of his internal complaints and his filings with the EEOC.

**129.** Plaintiff requests relief as provided for in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendants as follows:

1.  Awarding plaintiff compensatory damages for past and future emotional pain and suffering and mental injuries incurred as a result of the discrimination and retaliation against him as alleged in this Complaint;

2.  Awarding plaintiff damages pursuant to and within the statutory limitations of §102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a, insofar as applicable;

3.  Awarding plaintiff liquidated damages pursuant to the ADEA;

4.  Awarding plaintiff back pay;

5.  Awarding plaintiff front pay;

6.  Awarding plaintiff the reasonable costs and disbursements of this action, including attorneys' fees;

7.  Awarding plaintiff punitive damages; and

8.  Awarding plaintiff such additional relief as justice may require.

Dated: September 21, 2012
      Albany, New York

DONOHUE, SABO, VARLEY & HUTTNER, LLP

By: _____
Kenneth G. Varley, Esq.
Bar Roll No.: 102761
Attorneys for Plaintiff
24 Aviation Road, P.O. Box 15056
Albany, New York 12212-5056
(518) 458-8922

## JURY DEMAND

**PLEASE TAKE NOTICE**, that pursuant to Fed. R.C.i.v. P 38, plaintiff herewith demands trial by jury as to all issues so triable in this action.