**DeAnna J Schleusner**
**Attorney at Law**
**PO Box 9144**
**Rochester, MN  55903**
**SchleusLaw@gmail.com**
**507/881-9852**

November 9, 2015

VIA CM/ECF
Hon. Andrew T. Baxter
United States Magistrate Judge
Untied States Courthouse
100 South Clinton Street
P.O.Box 7396
Syracuse, NY  13221

Re:  Benson v. Family Dollar Stores, Inc., Family Dollar Stores of New York, Inc., and
       Family Dollar Operations, Inc.
       Civil Case No.:  6:12-CV-01457 (NAM/ATB)

Dear Magistrate Judge Baxter:

Plaintiff requests that the court deny all of Defendants' requests for protective orders. Plaintiff further requests that Defendants be ordered to supply the requested information and the requested deponents within a reasonable period of time. The requests to be decided are contained in Plaintiff's Request for Production of Documents II and Defendants' Response (Def. Ex. I and J) and Plaintiff's Notice of Deposition of Rule 30(b)(6) Witness and Request for Production of Documents. Ex. AA.

**Legal Standard**

The rules provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense..." Fed. R. Civ. Proc. 26(b)(1). Under either the current rule or the one that takes effect December 1, 2015, Defendants should be ordered to comply with the requested discovery. The 2015 Committee Note states "The 1983 Committee Note recognized 'the significance of the substantive issues, as measured in philosophic, social, or institutional terms. Thus the rule recognizes that many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved.' "  FRCP 26 Advisory Committee's Notes 2015.

While this may be a single Plaintiff employment law case, Plaintiff's complaint asserts six causes of action. The relevant time-period spans 2005 to 2011. Defendants answer

asserts thirty-five "separate and distinct defenses..." Defendants themselves are treating discovery as the serious matter in which it should be treated. Defendants have deposed Plaintiff for five days (some days partial) and have scheduled more time to depose Plaintiff. So far, Plaintiff has deposed six people employed by Defendants and has asked to depose two more employees of Defendants plus Rule 30(b)(6) witness(es) on specific subjects. In the Rule 26 Initial Disclosures, Plaintiff listed 47 people and Defendants listed 19 people that were likely to have discoverable information. Ex. M. In comparison to those numbers, the depositions have been limited.

In the current case Plaintiff alleges that he was discriminated against and retaliated against in violation of federal and state law. While the case itself may be about only Plaintiff, the implications of the case are much greater. Family Dollar is a large, publicly traded company. It had 70,000 employees. Ex. A, Levine , para. 1. Now that it has merged with Dollar Tree, the company has become even larger with impact on a greater number of employees and the public at large.

Plaintiff is entitled to discovery of all relevant facts even if there is a lot of information. FRCP 26(b). If relevant information can be withheld simply because there is a lot of relevant information in a particular case, then the party producing the evidence is able to limit which relevant evidence to produce and which relevant evidence to withhold by simply producing the least damaging items first and then arguing that they should not have to produce more because it is excessive.[1] In the present case, Defendants, have sole access to most of the relevant information.

**Confidentiality**

Defendants raise a concern about confidentiality of employee information a couple of times. The parties have a confidentiality agreement. Ex. B. Defendants have already disclosed other ratings and reprimands for some employees. Defendants are using this confidentiality concern only for selective document requests.

**Levine Deposition**

Plaintiff requested the deposition of Howard Levine, CEO of Family Dollar, because he has facts which cannot be obtained by other means. He is the highest level person within Defendants' open door policy. Ex. C, Team Member Handbook, Ex. D, Pomerleau,

---

[1] Defendants assert that they have produced in excess of approximately 3 million pages of documents in response to Plaintiff's document demands. This number is unrealistic as reviewing 3 million pages would have required basically two pages per second for every second of every day (1095 days) for three years. Many documents produced have multiple identical copies. Ex. BB, Dec. of Schleusner.

182:1-4; Ex. E, Halstead 42:10-43:3. Plaintiff sought Levine's help as part of the open door policy and did not receive a response from Levine.

Defendants allege that Plaintiff wants to depose Levine solely to harass Defendants. However, Plaintiff has acted in good faith in attempting to gain information from other sources in order to avoid taking the deposition of Levine including considering information via an affidavit of Levine, Interrogatories, Requests for Production of Documents, Requests for Admissions and depositions of lower echelon personnel. There remain questions that only Levine can answer. Ex. F, Venberg, 74:16-19; 188:17-24; Ex. G, Nielsen Day 2 210:4-212:6, Ex. E, Halstead, Day 2 p 27:8-20. When information was sought in the depositions about Levine's thoughts, defense counsel objected arguing "nobody can really know Mr. Levine's thoughts." Ex. G, Nielsen 210:4-211:21.

Apex depositions may be disfavored, but they are not barred, especially when the executive to be deposed has unique personal knowledge of facts relevant to the action. Alliance Industries, Inc. v. Longyear Holding, Inc., 2010 WL 4323071 at 4 (W.D.N.Y. March 10, 2010). Depositions of senior executives are permissible when such senior executives have had direct involvement in the underlying claims, or if the subordinates are unable to testify in a meaningful fashion at their depositions. See, e.g., Speadmark, Inc. v. Federated Dep't Stores, Inc., 176 F.R.D. 116, 117-18 (S.D.N.Y. 1997); Kuwait Airways Corp. v. Am. Security Bank, N.A., Civ. No. 86-2542, 1987 WL 11994, at *1-4 (D.D.C. May 26, 1987); Amherst Leasing Corp. v. Emhart Corp,, 65 F.R.D. 121, 122-23 (D. Conn. 1974). "Protective orders that completely prohibit a deposition should be granted only as an extraordinary measure which should be resorted to only in rare occasions." Byrd v. District of Columbia, 259 F.R.D. 1, 7 (D.D.C. 2009).

In the present case, Levine does have unique personal knowledge. His subordinates have been unable to testify meaningfully about some aspects. Eleven specific reasons for deposing Levine were provided to Defendants in a letter dated August 26, 2015. Ex H. The highlights of the reasons to depose Levine are:

1. Benson reported his allegation of Venberg's retaliation to Levine, Venberg's boss, and the upper most person of the Open Door Policy. Ex. F, Venberg 17:15; Ex. E, Halstead 60:9-10. Despite being the only person out-ranking Venberg, Levine forwarded Plaintiff's communication about Venberg's retaliation directly to Venberg. Ex. I, Ex. F, Venberg, 155:1-157:24, 169:12-19; Ex. S Def. Response to Req. for Admissions 98-101. Plaintiff needs to discover if Levine's failure to respond to his emails and forwarding it on to the alleged retaliator was standard practice, due to ignorance of this company policy, negligence or was intentional retaliation. Ex. E, Halstead Day 2 p. 16:9-17:1. Levine is the only person who can explain his thought process, reasons for his actions/inaction and intent.
2. Levine communicated with Venberg about Plaintiff. Ex. F, Venberg, 159:5-13; 183:23-185:1; 186:14-187:14; Ex. L, Agenda. In the affidavit Levine provides

     some details about his conversation and review of emails with Venberg. Ex. A, Levine, Para. 9. Venberg, during his deposition, claimed he never showed emails to Levine. Ex. F, Venberg 197:16-198:5. Levine is the witness with the best memory of that particular meeting.

3. Levine claimed "My only knowledge regarding the termination of Mr. Benson's employment from Family Dollar is a summary provided by legal counsel." Ex. A, Levine, para. 3. Later in the affidavit Levine directly contradicts this statement when he states, "...Mr. Venberg advised me Mr. Benson's employment had been terminated and showed me email exchanges between Mr. Benson and Reginald Johnson and Cathy Halstead regarding the termination." Ex. A, Levine, para. 9.
4. When the plaintiff was terminated he was told he was terminated for being dissatisfied with his employment. Ex. J, Script. The executive who terminated completed a company "Separation Form" stating the plaintiff resigned. Ex. K. Nielsen testified that "[t]he reason for his [Plaintiff's] termination was the insubordination." Ex. G, Nielsen day 2, p. 213:12-13. Plaintiff's immediate supervisor was not aware of any reason why Plaintiff should be terminated. Ex. D, Pomerleau 230:18-21. See also Ex. S, no. 105. Plaintiff needs to clarify what reason for termination was given to Levine.

Levine's affidavit claimed a deposition would cause unnecessary disruption to Family Dollar's business operations. A company should not be able to say the CEO is part of the "Open Door" policy of the company, encouraging employees to communicate their concerns along the chain of command, and then argue that the CEO is too busy to be deposed when an employee has tried to make use of that "Open Door" policy.

Potential violations of Federal and State law by a direct report to the CEO should be treated as a serious matter worthy of a CEO's time and attention. To do otherwise decreases the efficacy of these laws. This is not a case in which only the general feelings about policies will be addressed in the deposition. Plaintiff made repeated contacts to Levine asking for help. Levine forwarded those emails on to others including one of the named retaliators. Levine had at least one conversation with Venberg about Benson in which he was shown emails. Unlike the CEO in Ski Train Fire, Levine has personal, unique knowledge about this matter. In re Ski Train Fire, 2006 WL 1328259, 10 (S.D.N.Y. May 16, 2006).

Defendants allege that "plaintiff's real intent is to harass Family Dollar and its CEO." Plaintiff sought Levine's help within that Open Door policy. Plaintiff received no response from Levine. Instead, Levine forwarded one email directly to one of the alleged retaliators. This does bring into question whether Levine's subordinates were not accurately disclosing the situation to him or whether he was failing to function as the top of the Open Door policy for some other reason.

**Metadata**

Plaintiff has requested metadata of:  1) Plaintiff's Employee 2010 and 2011 reviews; 2) 2010 and 2011 Employee reviews of all loss prevention personnel and 3) HRD/VP Ratings of all personnel in loss prevention.

Meta data was requested by Plaintiff because of the inability of Defendants' employees to respond to questions meaningfully during their depositions. Initially, Plaintiff requested a Rule 30(b)(6) witness on the specific subject of Plaintiff's 2011 reviews. However, defense counsel suggested production of the meta data instead of a deposition saying "...we'll figure out the best way to get that information because I think it's valuable for everyone to have."  Ex. D, Pomerleau 190:1-192:13.

The request for the metadata for Plaintiff's employee reviews is the result of multiple copies of what alleges to be Plaintiff's 2011 year end review. One copy was provided to Plaintiff by Defendant on February 13, 2013 as part of Exhibit 5 of Defendants' Rule 26 Initial Disclosures which Defendants described as "Notes, Performance Evaluations, Response to EEOC Request for Information and Job Description Documents."  Ex. M, Def. Rule 26 Disclosure, Ex. N, Review dated August 23, 2011. A second document appearing to be Plaintiff's year end review for 2011 was provided to Plaintiff by Defendant on September 5, 2013 in response to Plaintiff's Request for Production of Documents. Ex. O, Review dated August 15, 2013. There are changes made between these two documents. Plaintiff's overall rating went from a 3.18 to a 3.0. Positive statements such as '"Chris has accepted the feedback and has displayed more intensity over the last two months" and "Enjoys Job" were removed in the later version. Statements such as "Team Relations investigations **are** handled in a timely manner" were changed to "Team Relations investigations **need** to be handled in a timely manner."  Despite these changes, Pomerleau testified that the comments in the first version were accurate. Ex. D, Pomerleau Day 2, 27:3-39:19; 50:1-51:17. In other words, Defendants have produced two different, ostensibly final versions (not drafts), of the 2011 year end review, one dated after Plaintiff's termination with no explanation.

The Interim Performance Reviews go through a similar change. One copy was provided to Plaintiff by Defendant on February 13, 2013 as part of Defendants' Rule 26 Initial Disclosures. Ex. P, Interim Review dated May 10, 2011. This is also Exhibit F to Defendants' May 29, 2012 letter to the EEOC. A second version is dated August 15, 2013 and was provided to Plaintiff by Defendant on September 5, 2013 in response to Plaintiff's May 29, 2013 Request for Production of Documents. Ex. Q, Interim Review dated August 15, 2013. Defendants have produced two different, ostensibly final versions (not drafts), of the 2011 mid-year review[2], one dated after Plaintiff's termination.

---

[2] There were additional versions of the 2011 mid-year review that were attached to emails showing those were drafts of the mid-year review.

Defendants state in their letter brief that "Mr. Pomerleau acknowledged he made the edits to the evaluations, but stated he was not sure which version was the final version without looking in the electronic system." Defendants provide no exhibit to this assertion. When asked whether he knew who changed one of the ratings between Exhibit M and Exhibit N, Mr. Pomerleau actually testified "I don't know if this is a more current review or what exactly the thing is. I guess I can't answer that. I don't know." Ex. D, Pomerleau 62:7-10. See also, p. 66:4-6. Neither Pomerleau nor Halstead knew any way the computer system kept track of which is a final draft and claimed no hard copy of the review is printed. Ex. E, Halstead, 38:2-40:22.

Defendants argue that only the portion of Plaintiff's request requesting "information clarifying which draft of plaintiff's 2011 employee evaluations was approved as final in Family Dollar's electronic system, as well as any available data that shows who accessed or edited the evaluations" is relevant. Plaintiff requested "metadata sufficient to determine when each review was altered, what was altered each time and by whom each alteration was done" for both the 2010 and 2011 final and interim reviews.

The metadata for the 2011 final and interim reviews are needed because of the changes to the reviews, possibly, given the dates and timing of production, after Plaintiff was terminated. The metadata for 2010 reviews of Plaintiff are requested to determine whether the 2011 final and interim reviews were treated differently than the 2010 reviews. For the same reason, the metadata for the same reviews (2010 and 2011 interim and final) for other Loss Prevention personnel is requested so that Plaintiff can compare whether his reviews were treated differently than similarly situated employees.

Neither the declaration of Tia Bryant nor the declaration of PeopleFluent answers the most important question of when the changes to the reviews were made. Neither of these describe what information was actually looked at or with what assurance they can give the information they have given other than it is not with absolute certainty.

Bryant's Exhibit A creates more questions. Bryant states Exhibit A "accurately identifies all electronic data I am able to view relative to the Benson Evaluations including the date/time the documents were initiated and the various users who had access to the documents." According to deposition testimony, only the immediate boss and the HR business partners who have proxy could get in to employee reviews to make changes. Ex. F, Depo. Venberg, 94:7-95:8.

In the 2011 Interim Evaluation section of Bryant Exhibit A, the last date is April 6, 2011. However, the evidence produced indicates that a change to the Interim Evaluation did occur sometime between May 10, 2011 (Ex. P) and August 15, 2013 (Ex. Q). In other words, there should have been some type of entry in the system after April 6, 2011. Bryant's affidavit indicates that Exhibit A includes the date/time the documents were initiated (presumably meaning "cause to begin"). The evidence provided indicates that a

version of the 2011 Interim review with manager comments existed by April 1, 2011 but Bryant Exhibit A has the first time Mr. Pomerleau listed as the Actor User as April 6, 2011, at least 5 days after a version of the 2011 Interim Review existed.

In the 2011 Final Evaluation section of Bryant Exhibit A, the last date is December 6, 2011. Although the documents show that changes occurred to the final review sometime between August 23, 2011 (Ex. N) and August 15, 2013 (Ex. O), Bryant Exhibit A does not say when those changes occurred nor does it tell us when Pomerleau started his evaluation as the documents show that one with his comments existed by August 23, 2011 but Exhibit A has September 2, 2011 as the first date Pomerleau's name appears as the Actor User.

The letter brief is the first time the cost and complexity were communicated to Plaintiff. In order to explore the issue of cost and information available, Plaintiff's counsel contacted PeopleFluent and spoke with inhouse counsel, Neil Salon, on Friday, November 6, 2015. Ex. BB, Dec. of Schleusner. According to Mr. Salon, the PeopleFluent software does not have metadata. The software is a database for which specialized quarries could be written to find information if the client, Defendants, had the software set to capture the information in the database. Mr. Salon was unable to answer what percentage of certainty could be had on the information provided in PeopleFluent's declaration. Mr. Salon was unable to explain what PeopleFluent looked at to make the assertion that it did not appear anyone other than Mr. Pomerleau made any changes to the reviews. Mr. Salon did not think PeopleFluent had been asked by Defendants to determine the dates on which changes to Plaintiff's reviews had occurred. Mr. Salon was not sure whether specialized quarries would be able to provide the dates upon which changes were made to the reviews but he indicated he would talk with his engineers to try to determine if the date would be information generally captured by the database. To date, Mr. Salon has not contacted Plaintiff with the response. Ex. BB, Dec. Schleusner.

Plaintiff would propose the court make a ruling that the requested information is relevant and discoverable, whether kept as Metadata or database information, and that PeopleFluent must turn over all of the requested metadata or database information for evaluation by Plaintiff. However, Defendant should be required to provide PeopleFluent's analysis of the information related to Plaintiff's 2011 mid-year and final evaluations, regardless of cost. The documents produced by Defendants raise serious questions about when and who made alterations to the reviews. Defendant produced two ostensibly final versions of each of these two 2011 reviews, one version of each dated after Plaintiff's termination and after discovery was requested while another version of each was produced as part of Defendants' Rule 26 disclosures and dated before Plaintiff's termination. Information such as when alterations were made, who made alterations and which version is the final version is the type of information a Plaintiff should be able to expect from Defendants. Defendants had a duty to preserve this type of evidence. Both of the 2011 evaluations, and the multiple versions of each, occurred after Plaintiff filed his

EEOC complaint and after his manager received a Litigation Hold Notice. Ex. R. Defendants should bare the burden of assuring the evidence of the final version of these reviews is actually the final version of the reviews and that evidence being held by Defendants has not been tampered with after Plaintiff's termination.

**HRD/VP Ratings**

Plaintiff requested copies of the HRD/VP ratings along with copies of instructions, documents indicating who did the ratings, documents indicating who was responsible for assembling, compiling and distributing the ratings. Def. Ex. B, Request for Prod. 1, 55, 56. At that time Defendants' supplied a version of LP Partner Review with just Plaintiff's scores and a version of the LP Partner review that had multiple employees listed. Plaintiff requested this information again following depositions. Def. Ex. I, Request for Prod. 1 of previously requested. See also Def. Ex. J with response. More than two years after the original request, on October 30, 2015, Defendants mailed a letter to Plaintiff finally providing the email that sent out the request for people to provide feedback for this review and some of the responsive emails. Ex. T. Unlike what Defendants previously indicated, the documents produced show that there were instructions to the people filling out the survey, the responses were not anonymous and the request to fill out the form did not tell the responders that the response was anonymous. The provided documents have responses from only two of the people requested to respond and do not contain at least one of the survey results about Plaintiff. Ex. T.  The HRD/DVP ratings or LP Partner Reviews are part of Plaintiff's allegations in his complaint in paragraphs 58, 59, 60, 75, 81, 82, 92 and 94.

Testimony about the HRD/DVP rating was contradictory. When looking at the specific document and asked about receiving the document in 2011, Pomerleau testified "This is the first time I think I've seen this one. I don't -- I don't recognize this at all." Ex. D, Pomerleau 87:9-13. Nielsen testified that he had received it by hard copy from Venberg. Ex. G, Nielsen 198:3-201:20; Day 2 p. 31:11-40. Venberg testified that he did not recall seeing a document like the survey results previously even though he was the senior VP of HR and LP and would have received a recap of any survey results. Ex. F, Venberg, 124:12-125:3; . p. 127:19-128:5. In fact, Venberg believed there were only two surveys and the VPs and HRDs might have been included in one of those. Ex. F, Venberg 127:2-10; 132:2-12.

Hours of time in discovery including questions in most of the depositions had already been spent trying to determine whether these reviews had actually occurred and who administered the review. Defendants had repeatedly indicated that all emails involving Benson had already been supplied. But these emails involved  Benson and were only supplied after repeated requests and more than two years after the original response to the request. The items that have been supplied still lack critical information. For instance, the responses to the survey emails are overwhelmingly missing. Another concern is that a

single person, appears to have rated Plaintiff twice. Ex. T. Given that the document is dated after Plaintiff filed his EEOC complaint, Defendants should have maintained all emails about the rating, all emails asking HRD/VPs to rate Plaintiff and other loss prevention personnel, all records of who rated Plaintiff, all records of these documents and surveys being forwarded, etc. Nielsen testified that he probably scanned in these ratings and emailed them to others but no such email has been produced in discovery. Ex. G, Nielsen 36:6-9.

Defendants have objected to Plaintiff's request for the metadata of these HRD/DVP surveys although it is not discussed in Defendants letter brief. Plaintiff requested the metadata "for all the ratings of ALL personnel in Loss Prevention done by Human Resources Directors (HRD) and Divisional Vice Presidents (DVP)" referring to the one for Plaintiff used in depositions. Def. Ex. I and J. Defendants asserted in their objection that there is no indication that the exhibit had been altered so discovery of the metadata should not be had. Defendants also assert that the ratings were submitted anonymously, implying that Plaintiff should not be allowed to know who rated him. Def. Ex. J. The October 30, 2015 disclosure by Defendants shows that the ratings were not submitted anonymously as responsive emails name the person responding and there is not even a representation in the email requesting the rating that the response will be anonymous. Ex. T. Given the nature of the testimony, the lack of disclosure in discovery (even with the documents disclosed on October 30, 2015) and the importance this rating plays in Plaintiff's complaint, the metadata is important and relevant to this case. Defendant should be ordered to review its records again to determine if additional responsive documents can be located including searching back-ups of the computer system. Defendants should be required to produce the metadata for the HRD/VP review documents. Defendants should also be sanctioned monetarily as the lack of disclosure for two years cost a great deal of time and expense as shown by the excerpts of testimony in the depositions.

**Littler Mendelson Deposition and Documents**

Defendant hired Littler Mendelson to investigate Plaintiff's complaint of discrimination and retaliation. Plaintiff seeks information relevant to that investigation. Plaintiff's reasoning for seeking this information is set forth in detail by letter dated August 31, 2015. Ex. U. The fact that it was attorneys conducting the investigation does not change the fact that this was an investigation, not provision of legal advice. Simply including an attorney in the communication or investigation does not equate to attorney-client privilege or work product privilege protecting the investigation from disclosure. U.S. Postal Serv. v. Phelps Dodge Ref. Corp., 852 F. Supp. 156, 160 (E.D.N.Y. 1994).

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." Brennan Ctr. for Justice at N.Y.

Univ. Sch. of Law v. U.S. Dep't of Justice, 697 F.3d 184, 207 (2d Cir. 2012) (quoting United States v. Mejia, 655 F.3d 126, 132 (2d Cir.), cert. denied sub nom Rodriguez v. United States, 132 S. Ct. 533 (2011)). The burden is on the party asserting attorney-client privilege to establish each element of these three prongs. See Mejia, 655 F.3d at 132.

For the privilege to attach, an attorney must be acting in the role of a legal advisor. See, e.g., In Re: Grand Jury Subpoena, 662 F.3d 65, 72 (1st Cir. 2011). In contrast, if an attorney acts in a non-legal capacity — for instance, interviewing fact witnesses in an investigation — the attorney-client privilege likely will not apply. Id. Similarly, when an in-house attorney provides business, rather than legal, advice, those communications are also unlikely to be privileged. See, e.g., U.S. v. Windsor Capital Corp., 524 F. Supp. 2d 74, 81 (D. Mass. 2007).

Legal advice must be the predominant purpose of the communication for it to be privileged. In Re Cnty. of Erie, 473 F.3d 413, 420 (2d Cir. 2007). For instance, draft reports for an investigation prepared by an attorney were not protected where the drafts were created "for the purpose of generating the Report, which indisputably did not provide legal advice." Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 104 (S.D.N.Y. 2007). "[T]he burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 144 (2d cir. 1987).

The work-product privilege protects documents created by counsel or per counsel's directive, in anticipation of litigation. In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002, 318 F.3d 379, 383 (2d Cir. 2003). Documents that would have been created in basically the same form even without anticipated litigation are not entitled to work-product protection. United States v. Adlman, 134 F.3d 1194, 2002 (2d Cir. 1998). The party asserting the work-product privilege bears the burden of establishing its application. Id. Even if work product protection applies, [d]isclosure of work may be ordered if the party seeking it can demonstrate substantial need for the information and an inability to obtain the information, or a substantial equivalent of it, by other means without undue hardship." Jean v. City of New York, No. CV-09-801, 2010 WL 148420, at 2 (E.D.N.Y. Jan. 12, 2010)

Defendants have withdrawn their Sixth Affirmative Defense (the allegation that Plaintiff failed to utilize internal complaint procedure) by letter dated October 2, 2015; years after Plaintiff initially requested the information. But this does not eliminate the need for the information or for deposing the investigator, Shanti Gaur.

Upjohn held that each case must be evaluated on its own facts to determine whether application of attorney-client privilege would further the underlying purpose of the privilege, which is to encourage candid communications between client and counsel for the purpose of rendering legal advice. Specifically, the court emphasized that the

privilege applies when "[t]he communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." Upjohn Co. v United States, 449 U.S. 383, 394 (1981).

The August 31, 2015 letter contains more detail regarding why neither the attorney-client privilege nor the work-product privilege apply to the Littler Mendelson investigation. Ex. U. The highlights of the reasons are:

1. Littler interviewed the same individuals that have been deposed. During depositions, the deponents claimed a lack of recollection often. Given that the Littler interviews were closer in time, the Littler notes are likely to have more content about the matter. For instance, the Littler report indicates that Nielsen told them that Plaintiff was not strong in training and teaching. Nielsen could not recall saying that. Ex. G, Nielsen 178:13-16.
2. Family Dollar's business policy is to investigate any claim that one of its policies has been violated. Family Dollar's stated policy is "[a]ll such allegations will be investigated thoroughly and as soon as practical after the complaint is brought to the company's attention." Ex. V, p. 2.
3. The Littler investigation was represented to be a Third Party Investigation, not an attorney investigating for Family Dollar in anticipation of litigation. Gaur told Plaintiff "Family Dollar has retained my law firm to investigate the claims that you have raised." Ex. W. She did not advise Plaintiff that she was representing Family Dollar as their attorney or investigating on behalf of in-house counsel.. Gaur told Plaintiff that Littler was "independent, and we're trying to evaluate your claims..." Ex. X, Gaur Transcript Portion. Howard Levine stated that he was told that Family Dollar handled the complaint by "retaining an outside law firm to conduct an independent investigation." Ex. A, Levine Aff. para 8. During depositions Halstead testified that it was her understanding that Family Dollar hired a third-party investigator and they did not give legal advice. Ex. E, Halstead, 177:15-178:8. Defendants have admitted that Littler was retained to complete a third party investigation and was not hired to give legal advice. Ex. S, Response to Req. for Admissions, 93 and 95.
4. To the extent that some form of privilege might have applied to the investigation conducted by Littler Mendelson, that privilege has been waived. In Defendants' Rule 26 Disclosure No. 1, Gaur was identified as an individual "likely to have discoverable information that defendants may use to support their claims or defenses..." Ex. M, Def Rule 26 Disclosure.
5. Even counsel for Defendants, Lynn Kappelman, stated during the deposition of Halstead "Littler Mendelson did do, I think, a non-privileged investigation, right?" Ex. E, Halstead, Day 2 p. 62:20-21.

Facts provided to investigator, regardless of attorney status, are not protected by attorney client privilege. See e.g. Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981). Even if privilege does apply, that privilege does not apply to the facts themselves. Therefore, the facts provided to Littler, whether provided by witness statements, emails or documents, are not privileged and should be disclosed. The need for this information is particularly great in situations like the current one in which witnesses profess lack of recollection and/or statements by the witnesses appear to have changed over time. Plaintiff requests that the court order Defendants to produce the requested documents. Plaintiff requests that he be allowed to depose Shanti Gaur about her investigation.

**Production of Documents by In-house Counsel**

Courts have recognized that in-house counsel may serve both legal and business functions. Courts, therefore, scrutinize the nature of their communications before finding that those communications are privileged. See In Re Cnty. of Erie, 473 F.3rd at 419, 421. In situations in which the attorney helps to supervise and direct internal investigations or is otherwise more an adjunct member of Defendants' human resources team, privilege does not apply. The status of attorney does not transform business and human resources advice into legal communications protected by privilege. Plaintiff requests that the court perform an in camera review of the requested documents to determine if the attorney client privilege applies or if the documents are business and human resource documents which should be produced to Plaintiff.

A detailed list of arguably not privileged communications and reasons was provided to Defendants by letter dated August 31, 2015. Ex. U. Highlights demonstrating a need for in camera review to determine if privilege is applicable are:

1. All communications with investigators managing how to conduct or proceed with the investigation, including documents and communications relating to the purposes and progress of the investigation. As argued above, the investigation should not be subject to privilege.
2. Any non-legal opinion information to or from in house counsel. For example, during Mellor's deposition, defense counsel excluded communications he received from the legal department when Mellor was asked "What instructions were you given if Mr. Benson showed up at this annual meeting?" Ex. Z, Mellor p. 70:4-11. How to handle a person from a security perspective is not legal advise.
3. All communications related to whether and when to terminate Plaintiff including drafts of the script for his termination. From depositions, it appears that the legal department decided that the reason for Plaintiff's termination was "It was clear from the verbal and written communications with management that you are unhappy and dissatisfied with your status with the company." Ex. J, Script. The factual basis from which this reason for termination came is not protected and is relevant. Venberg testified that he did not have anything to do with the script. Ex.

>F, Venberg 193:19-194:6. Nielsen testified that Halstead had given him the script and that he had nothing to do with writing the script. Ex. G, Nielsen 51:8-24, Day 2 208:11-14. Halstead testified that counsel drafted the script and she did not know the basis for the statements within the script. Ex. E, Halstead, 149:15-151:10. See also Ex. E, Halstead 64:1-65:18; 70:10-14. Halstead testified that she worked with Nielsen and legal in terminating Plaintiff. Ex. E, Halstead 24:7-16. Defendants' Rule 26 disclosures indicate the possibility that in house counsel Reginald Johnson may have been involved in the situation at least partially for human resource and business reasons, not just for legal advise. Ex. M, Rule 26 Nos. 1 and 2.

**Person of Concern List**

A Person of Concern List relative to the 2013 Annual Shareholders' Meeting was produced during discovery. Ex. Y. The email was from Mark Mellor. Mellor was deposed on July 31, 2015. Plaintiff has requested all lists for 2011 to present and noticed a Rule 30(b)(6) witness to testify about these "person of concern" lists. Defendants assert that Mark Mellor was responsible for this "person of concern" list. His testimony about the list can be summarized as follows: other people tell him who to put on the list, all names on list besides Plaintiff's came via email from corporate communications/investor relations, Plaintiff's name was placed on the list verbally by either Chris Nielsen or Cathy Halstead, Mellor did not know any details about why individuals were placed on the list and that once on the list, people stayed on the list as no one ever directed him to remove someone from the person of concern list. Ex. Z, Mellor 53:18-55:21, 58:1-4, 63:12-80:2.

Defendants indicate that all such lists that identify plaintiff from 2010 through 2013 have already been produced. Plaintiff requested the lists up to the present as well as other information about the lists. Ex. AA, Notice of Depositions; Def. Ex. I and J no. 5. Plaintiffs also noticed a Rule 30(b)(6) witness deposition on these issues. In their letter brief, defendants say that "Mark Mellor is responsible for this list" however, in Mellor's deposition it is apparent that although he may communicate this list to security personnel, he has no decision making authority over who is put on the list and does not know how a person is put on the list. Ex. Z, Mellor p.53:18-54:6. Mellor's lack of ability to meaningfully testify about this person of concern list is the reason the 30(b)(6) notice of deposition included a request to depose a person knowledgeable about the list and a detailed request for production of documents about the person of concern list.

Defendants argue that the lists are irrelevant. However, retaliation can occur post-termination. Robinson v. Shell Oil Co., 519 U.S. 337 (1997). In the current case, Plaintiff was put on this "person of concern" list in 2013, two years after he was terminated but only about three months after this litigation was started in September 2012. Mellor testified that the list was given to the people in security for the annual shareholder meeting including a Charlotte police officer, people who were helping to organize the meeting including the person that was going to order lunch and the maintenance person

who would put up the parking signs. Ex. Y, Ex. Z, Mellor 50:3-53:5. Being put on such a list is retaliatory unless Defendants had a reasonable basis for putting Plaintiff on the list. Mellor testified that 2014 had a person of concern list "[p]robably the same list." Ex. Z, Mellor p. 73:7-16. Plaintiff is entitled to know why his name was placed on the list, whether his name was on the 2014 or 2015 list and to whom the lists were distributed.

## Bonus Payments/Stock Options

During the depositions, counsel had agreed to produce a document that would provide the specific date on which a person in Plaintiff's position would have needed to be employed to receive the 2011 bonus payment. Plaintiff reminded Defendants of this agreement by email dated August 28, 2015. In response, Defendants referred to previously produced documents saying Plaintiff was not eligible. Ex. CC. As a result, Plaintiff noticed the Rule 30(b)(6) deposition. Ex. AA. The email providing the date the bonus was paid was sent on September 14, 2015. Def. Ex. N. On its face, this provides the date the bonus was paid, not the date on which an employee needed to be employed in order to be entitled to receive the bonus. Plaintiff has served Defendants with a brief set of Interrogatories about the bonus as requested by Defendants. Ex. DD. If responded to fully, there will be no need for a Rule 30(b)(6) witness on this issue. Plaintiff requests the court rule that the Rule 30(b)(6) witness deposition on this issue should go forward unless full answers to the Interrogatories are received.

## Documents About Mike Zuege and Van Mills

Mike Zuege was Plaintiff's second line supervisor when Plaintiff filed an internal complaint that direclty involved Zuege. Another employee had also filed a complaint about age discrimination while Zuege led the department. In the investigative notes of that complaint, Halstead's notes indicate "Did find something to address but cannot go into details." Halstead did not recall what was addressed or who it was addressed with. Ex. E, Halstead 45:16-46:4. Plaintiff filed his EEOC complaint on February 21, 2011. Zuege was terminated on March 4, 2011, just days after the EEOC complaint. The comment made in Halstead's report combined with the close proximity in time of Zuege's termination to Plaintiff's filing of the EEOC complaint make any reprimands of Zuege, reasons for termination and separation agreement potentially relevant.

Besides investigating Plaintiff's internal complaint, Vann Mills drafted Defendants' first EEOC response, March 18, 2011 letter to EEOC. A Memorandum about Vann Mills was received in discovery. This memorandum indicates that Cathy Halstead met to discuss work issues with Mills on April 7, 2011. The EEOC requested more information from Defendants by letter dated June 9, 2011. Mills was given a Memorandum on June 22, 2011. Mills was terminated on July 12, 2011, days after Plaintiff's memorandum on July 7, 2011. The proximity in time to the events of this case make this potentially relevant.

## Conclusion

Plaintiff respectfully requests that the court deny Defendants' motion for protection in its entirety. Levine may be the CEO of Family Dollar but he has personal, unique knowledge relevant to this litigation making his deposition appropriate. The notices for Rule 30(b)(6) witnesses and the document requests related to the HRD/VP survey and the person of concern list are also relevant and needed. Neither the 30(b)(6) witness and documents about the reviews or the bonuses will be needed if the metadata (or database information) is produced and the new Interrogatories answered respectively.

All of the metadata (or database information) requested by Plaintiff should be ruled as relevant and discoverable. At a minimum, Defendants should be required to bear the cost of PeopleFluent's analysis of who and when changes were made to Plaintiff's 2011 interim and final reviews. The remaining metadata (or database information) should be produced with Plaintiff choosing which expert to use to analyze the metadata (or database information) depending on whether Plaintiff continues this to be necessary following receipt of the analysis of Plaintiff's 2011 interim and final reviews.

Defendants should be sanctioned for withholding requested information about the HRD/VP ratings for more than two years. This failure to produce cost a great deal of time and effort to review and to question witnesses during depositions. Defendants should be required to disclose any remaining records related to the HRD/VP ratings as well as the metadata. To the extent Defendants are unable to locate additional records about the HRD/VP ratings, an adverse inference should apply as Defendants had a duty to maintain all records related to Plaintiff after his EEOC complaint had been filed.

Defendants should be ordered to produce all documents and communications between Littler Mendelson and Family Dollar related to Plaintiff up until the date of his termination including everything in the investigation. Plaintiff should be allowed to depose Gaur. Documents from in house counsel should be produced for in camera review to determine whether any of them relate to running the business instead of legal advice.

Defendants should be ordered to produce the requested documents about Zuege and Mills. While there is no way to tell if they are in fact related to this litigation until reviewing them, the timing of the write-ups and terminations of these two individuals who were intimately involved in handling Plaintiff's allegations internally makes it worth looking at to determine if they are relevant.

Dated:  November 9, 2015                _/s/ DeAnna J Schleusner_____
                                        DeAnna J Schleusner
                                        NY Atty No. 603036)
                                        PO Box 9144
                                        Rochester, MN  55903