# HANCOCK ESTABROOK, LLP

COUNSELORS AT LAW

**ROBERT C. WHITAKER, JR.**
*rwhitaker@hancocklaw.com*

November 13, 2015

**VIA CM/ECF**
Hon. Andrew T. Baxter
United States Magistrate Judge
United States Courthouse
100 South Clinton Street
P.O. Box 7396
Syracuse, New York 13261

  Re: ***Christopher R. Benson v. Family Dollar Stores, Inc. et al.***
     **Civil Action No.: 12-CV-1457 (NAM/ATB)**

Dear Magistrate Judge Baxter:

  Defendants submit this letter brief as their reply to plaintiff's November 9, 2015 response to the pending motion for a protective order. In accordance with local rules, this reply was authorized by the Court via Text Order on October 21, 2015. Dkt. No. 60. Because of the important of the issues, defendants respectfully request oral argument on the motion before a decision is rendered.

  As a preliminary matter, plaintiff attempts to justify the scope of discovery sought because there are "six causes of action". While technically six causes of action are asserted, three are parallel state law claims. All of the causes of action are based on the same allegations. Ultimately this is a run of the mill single plaintiff employment discrimination action, similar to those that are filed every day against large corporations. There is nothing unique or extraordinary about this action.[1]

### Levine Deposition

  Plaintiff does not distinguish the key facts and case law cited by defendants that support the Court granting an order of protection. Significantly, it is undisputed that Family

---

[1] Plaintiff disputes whether approximately 3 million pages of documents have been exchanged. Plaintiff is wrong. While I have not personally counted every page, in February 2015 defendants asked one of its litigation vendors, Avalon, for an estimate to OCR the email files produced in response to plaintiff's request for all email correspondence with plaintiff. Avalon concluded there were 2,583,611 pages of emails. Further, defendants disclosed many thousands of pages of documents and plaintiff initially produced nearly 2,000 pages of documents and eventually more than 160 audio recordings. In November 2014 plaintiff produced for the first time CDs containing more than 2,000 electronic files responsive to document demands first served by defendants a year and a half earlier. *See* **Exhibit A**. Each file contains anywhere from a single page to more than 100 pages.



**HANCOCK ESTABROOK, LLP**
COUNSELORS AT LAW

November 13, 2015

Dollar's CEO was not involved in any decision making relative to plaintiff's employment.[2] Nonetheless, plaintiff attempts to distract the Court with alleged issues that have already been addressed through discovery or are completely irrelevant to the action.

Plaintiff first argues that deposing the CEO is necessary to determine whether the forwarding of plaintiff's May 10, 2011 email correspondence to Bryan Venberg was "standard practice, due to ignorance of company policy, negligence or was intentional retaliation." Dkt. No. 64 at p. 3. However, this question was answered in paragraph seven of Mr. Levine's affidavit, where he states regarding the May 10, 2011 email correspondence:

> Although I do not recall receiving these e-mails, a review of records confirms that I immediately forwarded them to Bryan Venberg, Senior Vice President of HR, and asked him to handle the matter. *This, again, is consistent with my normal business practice of having HR and/or legal deal with such issues. Other than forwarding these e-mails to Mr. Venberg for action, I have no other personal knowledge regarding them...*

Dkt. No. 64-1 at p. 2 (emphasis added). Further, plaintiff's condescending language regarding the CEO's alleged ignorance of company policy and negligence coupled with plaintiff's argument that he must determine if "Mr. Levine was unable to fully function as the CEO of Family Dollar in 2011", reveals plaintiff's intent to harass the CEO. Dkt. No. 57-6 at p. 5[3].

Plaintiff's second argument is based on a conversation between Mr. Venberg and the CEO during the first week of November 2011 in which the CEO was advised of Benson's termination. But it is undisputed that this brief meeting occurred weeks <u>after</u> plaintiff was fired on October 14, 2011. Such a post-termination discussion to apprise the CEO of plaintiff's firing has no relevance to plaintiff's claims, particularly since it is undisputed that Mr. Venberg did not make the decision to fire plaintiff. Dkt. No. 57-7; *Deluca v. Bank of Tokyo-Mitsubishi UFJ*, 2007 WL 2589534 (S.D.N.Y. Aug. 30, 2007) (granting protective order precluding deposition of CEO who did not participate in decision to terminate plaintiff's employment, but was apprised of the pending termination and communicated with subordinate employees post-termination regarding plaintiff's termination); *c.f. Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395-96 (7th Cir. 1997) (affirming district court's determination that post-termination communications were irrelevant to plaintiff's ADEA claims and finding that even if the CEO made the alleged statements regarding plaintiff's

---

[2] As a point of clarification, plaintiff did not request an affidavit from the CEO as suggested. Plaintiff maintained his intent to depose the CEO before any other depositions occurred. It was defendants who offered an affidavit with the hope plaintiff would withdraw its demand. It was only upon the threat of seeking a protective order that plaintiff finally agreed to complete other depositions before renewing this issue. It is rather obvious that plaintiff approached depositions with the goal of finding some basis to depose the CEO.

[3] Plaintiff's argument that an issue of fact concerning retaliation is raised by Mr. Levine's forwarding of plaintiff's May 10, 2011 to Mr. Venberg to handle is equally unavailing. This e-mail was nothing more than conjecture about what Mr. Nielson may have said to Mr. Venberg concerning a Regional Manager position that is buried six pages into the lengthy e-mail. Dkt. No. 64-9 at p. 6. Here again, there is nothing to suggest personal knowledge on the part of Mr. Levine to support yet another conspiracy theory advanced by plaintiff.



November 13, 2015

termination, it could not support plaintiff's claim because the CEO was not involved in the decision to terminate plaintiff).

Third, plaintiff argues that the CEO's affirmation that his only knowledge regarding plaintiff's termination is a summary provided by legal counsel conflicts with the fact that the CEO was apprised of plaintiff's termination in November 2011. However, plaintiff ignores the fact that the CEO's affidavit states that he does not recall anything regarding the brief discussion with Mr. Venberg, other than the fact that it occurred. Dkt. No. 64-1 at p. 3. These statements are entirely consistent. It should be of no surprise that four years later the CEO does not recall any details of a brief conversation apprising him that one of the company's more than 70,000 employees was fired.

Fourth, plaintiff argues he "needs to clarify what reason for termination was given to Levine." This is essentially a reiteration of plaintiff's prior argument based on the fact that Mr. Venberg apprised the CEO of plaintiff's termination weeks after he was fired. As outlined above, this information is irrelevant and a protective order is appropriate. *Deluca*, 2007 WL 2589534 at *4-5.

Lastly plaintiff claims he "made repeated contacts to Levine asking for help" and based on these contacts, the CEO has personal and unique knowledge about this matter. But it is undisputed that plaintiff's "contacts" consisted of transmitting three e-mails to the CEO and copying him on another. This exact issue was addressed in *Trusz v. UBS Realty Investors LLC*, 2011 WL 577331 (D.Conn. Feb. 8, 2011). In *Trusz* the court rejected plaintiff's argument and issued a protective order. This precedent is outlined in more detail in defendants' original letter brief. Tellingly, plaintiff did not even address this decision or the other authority cited by defendants.

**Metadata for Plaintiff's Evaluations and Reviews**

Plaintiff commingles multiple issues, ignores deposition testimony and misrepresents facts in a transparent effort to create confusion in the hopes of obtaining a favorable ruling. But the issue is quite simple. Defendants produced draft versions of plaintiff's 2011 evaluations as well as the final versions approved by plaintiff's supervisor, Christopher Pomerleau. Mr. Pomerleau testified that the various drafts were prepared solely by him. **Exhibit B** at p. 186-87 ("These were my words. These were my reviews that I completed").

The issue that prompted the discussion of meta data was the fact that Mr. Pomerleau could not state with certainty which of the evaluations was the final version without checking Family Dollar's electronic system. Ex. B at pp. 8-10, 22-23 & 59-60. This is understandable as it's been four years since he prepared the documents. Defendants subsequently reviewed their system and confirmed for plaintiff which of the produced evaluations are the final versions saved in Family Dollar's system. *See* **Exhibit C**. The issue has been resolved without the need for spending tens of thousands of dollars to try and obtain underlying meta data.



November 13, 2015

Plaintiff's request for meta data greatly exceeds this single issue. Plaintiff's current position is that meta data is also needed because of an unsupported theory that the evaluations may have been altered after plaintiff was fired. Plaintiff alleges the two drafts of 2011 Interim Reviews are "dated" May 10, 2011 (Dkt. No. 64-16) and August 15, 2013 (Dkt. No. 64-17). Plaintiff then argues the reviews were edited between these dates to support a conclusion that the declaration by Family Dollar's Systems Analyst, Tia Bryant, is inaccurate, requiring the production of additional electronic data to confirm when these documents were edited and by whom. Dkt. No. 64 at pp. 6-7.

Plaintiff deliberately attempts to mislead the Court. The May 10, 2011 and August 15, 2013 dates at the top of the Interim Reviews represents the dates the document were <u>printed</u>. There is no evidence these documents were edited on these dates.

This fact is obvious from the documents which contain the same date on the lower right hand corner connected to a hyperlink titled: https://familydollaratm.authoria.net/**print**..." (emphasis added). Plaintiff's counsel acknowledged this fact during depositions. For example, when questioning Mr. Pomerleau, plaintiff's counsel stated "you've been handed a document labeled P-78. That appears to be another version of Mr. Benson's midyear performance review for 2011. *Looks like there's a print date of May 10, 2011*". Ex. B at pp. 7-8 (emphasis added). Mr. Pomerleau subsequently confirmed these are print dates. Ex. B at p. 189 ("I see different print dates at the top" of the reviews).[4]

Plaintiff makes the same disingenuous argument regarding the 2011 Final Evaluations, claiming they were edited sometime between August 23, 2011 and August 15, 2013. Again, these are dates the documents were printed as acknowledged by plaintiff's counsel at depositions. Specifically, plaintiff's counsel stated in reference to P-79, "…the one that looks like it was printed out on August 23, 2011, gives a manager rating of 4; and the one dated August 15, 2013, has a manager rating of 3." Ex. B at pp. 61-62. Further, Ms. Bryant has confirmed these are print dates. Exhibit C.

It is difficult to understand how plaintiff could in good faith completely disregard the fact that these are print dates, and misrepresent to the Court that these are dates the documents were edited. Frankly, this serves as further evidence of why a protective order is appropriate. Plaintiff remains committed to twisting facts to engage in an endless pursuit of harassing defendants through lengthy and expensive discovery to support wholly unsubstantiated conspiracy theories.

Plaintiff uses this bogus argument to claim he does not know the origins of the draft reviews. But Mr. Pomerleau testified that he frequently cut and pasted from different reviews and had multiple draft versions before finalizing and approving one in the system. Ex. B at pp. 184-88. Most importantly, Mr. Pomerleau acknowledged he edited the evaluations and the various drafts contain only his words. Ex. B at pp. 9-11 & 184-87.

---

[4] By way of example, the evaluations attached to Exhibit C contain a print date of November 13, 2015 at the top and bottom right corner of the first page. That is because Ms. Bryant printed them from the system today.



Plaintiff also attacks the reliability of Ms. Bryant's declaration claiming it fails to show the Interim Review was edited between May 10, 2011 and August 15, 2013. Again, plaintiff makes an unsupported assumption the document was edited during this time frame based upon a misrepresentation of the print date as an edit date. The same flawed logic is used to conclude that Ms. Bryant's declaration should reflect edits to the 2011 Final Evaluation between August 23, 2011 and August 15, 2013. This is another speculative theory by plaintiff disconnected to any facts and unsupported by any evidence.

Next plaintiff's counsel cites her own summary of a conversation with Corporate Counsel for PeopleFluent, Neil Salon, to try and muddy the waters. In essence counsel relies on hearsay to allege that Attorney Salon's inability to speak to the technical details of the company's analysis and capabilities somehow contradicts the declarations provided by PeopleFluent's Chief Customer Officer and Ms. Bryant.

This argument is flawed for several reasons. First, Mr. Salon is an attorney, not a software engineer and he did not provide the declaration. It is not surprising an attorney cannot speak in great detail to such technical issues. Second, Mr. Salon has reviewed Ms. Schleusner's declaration and advised that it mischaracterizes their conversation. **Exhibit D**. Such controverted hearsay is of no value to this motion.

Finally, plaintiff asks the Court to issue an Order directing PeopleFluent to produce various information. Plaintiff ignores the fact that PeopleFluent is a third party unrelated to defendants and has been communicating with the parties as a courtesy. PeopleFluent has not been subpoenaed, is not a party to this action and has not otherwise been given proper notice to be heard on this matter. Such a request is procedurally defective and improper.

**Meta Data for All LP Employee Reviews**

Plaintiff offers no meaningful argument to support its request for meta data pertaining to two years of confidential employee evaluations related to more than 60 individuals. The request for such a large number of confidential evaluations alone is overly broad and improper. *See Palmer v. New York State Office of Court Admin.*, 2009 WL 1118271 (N.D.N.Y. Apr. 27, 2009) (denying plaintiff's request to compel production of non-party employee personnel records and noting the production of such confidential information is generally disfavored). But plaintiff goes even further, asking for all the underlying meta data of such reviews. Plaintiff provides no support for this request, except to lump these hundreds of evaluations in with his frivolous argument wherein he wrongly relies on the print date to suggest documents have been edited as discussed above. This argument is so lacking in merit that defendants will not address it further and rely on the objections and authority set forth in their original moving papers. A protective order is appropriate. *Id.*

**HRD/DVP Ratings and Related Meta Data**

Defendants have produced all HRD/DVP ratings and related information in their possession. Defendants maintain that this information is confidential and irrelevant as these



ratings occurred in 2011, well after the realignment, and had no bearing on the decision to fire plaintiff.[5] However, to try and move discovery forward, defendants provided plaintiff all HRD/DVP ratings and related correspondence in their possession, but redacted comments in the review section that pertain to Directors and Vice Presidents.[6]

Plaintiff misrepresents the information provided to conclude the HRD/VP ratings were not anonymous. Of course, plaintiff offers no evidence to support this false conclusion. As indicated to plaintiff, Dana Levadnuk only collected the anonymous surveys. When leadership met to review the ratings, they were given ratings without any identifying information. *See* **Exhibit E**. The material reviewed by leadership was anonymous. Obviously someone had to serve as the collection point for the data, but Ms. Levadnuk played no role in considering the ratings or in any decisions related to plaintiff's employment.

Although plaintiff makes general and conclusory assertions regarding testimony about the HRD/DVP ratings, the fact remains that defendants objected in good faith to these documents when first requested. *See* Dkt. No. 57-2 at p. 15. Plaintiff did not oppose these objections or renew its request for this information again until August of 2015. Dkt. No. 57-9 at p. 3. In fact, plaintiff did not define or limit the scope of his request for HRD/DVP ratings temporally or otherwise until October 9, 2015. **Exhibit F** at p. 2. Defendants subsequently produced the requested information on October 30, 2015. Dkt. No. 64-20.

Plaintiff's request to sanction defendants under such circumstances is improper. This request is unsupported by fact or law, procedurally defective and violates local rules. The pending motion is defendants' motion for a protective order. Plaintiff has not sought permission to file a cross motion or provided any notice of cross-motion. The request for sanctions also ignores local rules and is improper on that basis alone. For these reasons plaintiff's request should be denied.

**Littler Mendelson Deposition and Documents**

Plaintiff's argument confirms its misunderstanding of the work product doctrine. It is undisputed that the investigation was done at the request of legal counsel in anticipation of litigation. As set forth in defendants' original moving papers, there is substantial precedent that such information is protected as work product. Notably, plaintiff does not even attempt to distinguish the case law cited by defendants, relying instead on inapposite authority directed to attorney client privilege. For the reasons set forth in defendants' original motion papers, a protective order is appropriate.

Plaintiff asserts that the identity of individuals as potential witnesses in defendants' initial Rule 26 disclosures constitutes waiver of privilege. But plaintiff offers no case law to

---

[5] Relevant documents were filed under seal by plaintiff's counsel.
[6] Information regarding Directors and VPs is redacted because these individuals are not similarly situated to plaintiff. They had different job titles and responsibilities as supervisors two and three levels above plaintiff's position and such confidential information is not comparable data. *Palmer*, 2009 WL 1118271 at * 1-2; *Kean v. Jack Henry & Assoc., Inc.*, 577 Fed.Appx. 342, 347 (5th Cir. 2014) (court properly precluded discovery of supervisor's performance appraisals as irrelevant to plaintiff's ADEA claims).



support this argument and defendants are unaware of any such authority. Regardless, the protection is under the work product doctrine.

Remarkably plaintiff also tries to take a comment by defense counsel during a deposition out of context to support his argument. Defendants made clear before depositions that the Littler investigative file is work product and provided a letter confirming their position with supporting case law on May 1, 2015. **Exhibit G** at p. 3.

**Production of Documents by In-house Counsel**

The arguments presented by plaintiff are not supported by any facts. Rather plaintiff speculates that Attorney Johnson might have engaged in business decisions. This speculative argument is meritless. And again plaintiff fails to even address the case law cited by plaintiff that supports their motion. For these reasons, and the arguments in defendants' original papers, a protective order is appropriate.

**Person of Concern List**

Plaintiff offers no new facts to contradict defendants' position regarding this information. In short, plaintiff argues that he should be given this information which pertains to a list prepared years after he was fired, because it could constitute post-termination retaliation. Defendants respectfully submit that this issue further highlights plaintiff's harassing pursuit of clearly irrelevant discovery.

Plaintiff cites *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) to support his theory. However, *Robinson* was a Title VII case where post-employment retaliation was based on the alleged employer giving a negative job reference to a prospective employer. Here the issue is placement of plaintiff on a person of concern list years after he was fired. It is undisputed that this list pertained to annual shareholder meetings a thousand miles away from plaintiff in Charlotte, NC, and that being on the list did not mean anything except that security would keep an eye on you if you attended the meeting. Dkt. 57-8 at p. 2. It is obvious that being on the list could not have, and did not impact plaintiff in any way and cannot support a post-employment retaliation claim.

**Bonus Payments/Stock Options**

On September 14, 2015 defendants suggested plaintiff issue an interrogatory to confirm the date that bonuses were paid to LP in 2011. Dkt. No. 57-14. Plaintiff's response to this motion is the first time plaintiff has indicated any willingness to take this approach in lieu of a deposition. However, like with all other discovery, plaintiff greatly exceeds the scope of the relevant issue and serves 10 interrogatories. *See* Dkt. 64-30.

This is typical of plaintiff and an example of why we are before the Court again for discovery issues. Rather than take the simple and logical solution proposed by defendants, plaintiff served 10 interrogatories covering a broad spectrum of issues. Plaintiff feigns a need for these interrogatories because although the exact date bonuses were paid has been



November 13, 2015

provided, he does not know "the date on which an employee needed to be employed" to receive the bonus.

As outlined for plaintiff one month ago, the plan (which was provided to plaintiff) clearly states that employees must be actively employed when bonus payments are made. Dkt. 64-29. Defendants disclosed that bonuses for 2011 were paid October 25, 2011. Dkt. 57-14. Therefore, an employee had to be employed on October 25, 2011 to receive the bonus. Plaintiff was discharged on October 14, 2011.

Thus, the information has been provided. Further, plaintiff's 10 interrogatories greatly exceed the issues presented to defendants and the Court, asking for confidential pay data for the entire LP department. As a result, defendants have offered to answer two relevant interrogatories and asked plaintiff to withdraw the remaining extraneous interrogatories. If plaintiff would take this simple step the issue would be fully resolved. **Exhibit H**.

**Documents About Mike Zuege and Van Mills**

Plaintiff's response does not offer any facts or case law to support its position. Instead, plaintiff speculates that the requested confidential and irrelevant information could be "potentially relevant," (Dkt. No. 64 at p. 14) but offers no explanation as to how it could be potentially relevant. Defendants stand by their original submissions.

**Conclusion**

Plaintiff's response is littered with conclusory and speculative assertions that are unsupported by fact or law. Plaintiff should be precluded from his endless pursuit of costly and irrelevant information. Plaintiff has wasted enough time and resources of the parties and the Court. Defendants' motion should be granted in its entirety.

Very truly yours,

HANCOCK ESTABROOK, LLP

Robert C. Whitaker, Jr.

RCW:mlt
Enclosures
cc:   DeAnna Schleusner, Esq.